[Crim. No. 3313.   First Dist., Div. One.   July 12, 1957.]

THE PEOPLE, Respondent, v. JOHNNY TRAPPS, Appellant.

Mas Yonemura, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Marvin J. Christiansen, Deputy Attorney General, for Respondent.

PETERS, P. J.—Defendant, Johnny Trapps, after a trial before the court without a jury, was found guilty of rape. He appeals from the judgment of conviction and from the order denying his motion for a new trial. The sole contention made is that the evidence is insufficient to support the judgment because, so it is claimed, the testimony of the two major prosecution witnesses, Geraldine Porter and Betty Joyce Lewis, is inherently improbable, and, for that reason, should not be believed. There is no merit to the contention.

Although there are inconsistencies in the testimony of the complaining witness, Mrs. Porter, and although her story, in some respects, is somewhat unusual, the trial judge, the Honorable James Agee, saw and heard this witness. It was his duty to pass upon her credibility. This he did by stating, at the conclusion of the trial, that he found that she made a "nice appearance," and appeared "to be a respectable person." He was not impressed with the story told by the defendant. These were matters for the trial court to decide and are not matters that may successfully be urged on appeal.

Mrs. Porter and Mrs. Lewis, both of whom were separated from their husbands, lived together on the second floor of a house at 32nd and Ettie Streets in Oakland. A male relative of Mrs. Lewis also lived on that floor, and tenants lived on the first floor. Shortly after midnight on May 22, 1956, Mrs. Porter left the house to make a telephone call and to get some cupcakes. She first went to a liquor store about three blocks from her home. There she found the telephone booth was occupied. She then went to Moton's, a combination café and bar, located nearby. Here she found that the place was so noisy that it was impracticable to use the telephone. She sat at the end of the bar, bought some cupcakes and ordered and paid for a bottle of beer or ale, and started

to play some records on the record player. After she had consumed the first bottle of beer, the proprietor of the establishment, John Moton, introduced her to a friend of his, a Mr. Hamilton, and told Mrs. Porter that Hamilton wanted to buy her a drink. At first Mrs. Porter declined, but, upon being assured by Moton that there were no "strings attached," she accepted, and a second bottle of beer was placed before her. She consumed about half of this bottle. Then another bottle of beer was placed before her. She testified that she had no idea who purchased this bottle. She then asked Moton for a bag and put in it the full bottle of beer, the half empty bottle of beer and the cupcakes. She then went back to the liquor store and made her telephone call. Then she started towards her home. It was now about 2 a. m. When she reached 32nd and Helen Streets, a man she identified as defendant Trapps, whom she testified she did not then know, "jumped out" from behind a hedge. He had an open knife in one hand. He grabbed her with the other hand and said, "You're going with me." He then pushed her down Helen Street and into the garage of a house. Mrs. Porter testified that she was terrified and tried to talk defendant out of assaulting her. She managed to get out of the garage and back to the intersection of 32nd and Helen Streets. Here defendant slapped her face, and said to her: "You don't seem to realize I mean business; you're going with me." Then, still carrying the open knife in his right hand, he pushed her across the street where an automobile was parked, and slapped her twice again. Then he pushed her into the back seat, put the knife to her throat and told her: "It's nothing for me to cut your throat, you're going to be mine . . . I've been wanting to do this for a long time." She testified that she pleaded with him to let her go and offered him $50 which she had in her purse, but he refused. He then had sexual intercourse with her. Then he started to smoke a cigarette. She pleaded with him to let her go and started to cry. He told her to "stop crying" because "he couldn't stand to see anyone cry." He then, against her will, had a second act of intercourse, and then told Mrs. Porter that he was going to "walk her home."

The two started towards Mrs. Porter's house. She testified that when they were nearly there, defendant said he was cold, so she gave him the sweater she was wearing. She explained this by stating that she feared that if she did not give him the sweater he would not take her home, but would take her

some place else. Defendant then accompanied her to her home. He then took her up to the second floor and into the bedroom that Mrs. Porter occupied with Mrs. Lewis. Mrs. Lewis was asleep, it now being about 4 a. m. Mrs. Porter awakened Mrs. Lewis and asked her if she knew the defendant. Mrs. Lewis said that she knew defendant. Then Mrs. Porter said ''Well, he just pulled a knife on me, slapped me three times and forced me in a car and raped me.'' Mrs. Lewis then jumped out of bed and said: ''Yes, I know you did it. Call the police,'' and tried to hold the defendant. Mrs. Porter went into the kitchen and got a knife. The rumpus awakened the tenants downstairs, the Beals, and Mr. Beal took the knife from Mrs. Porter. Mrs. Porter then chased the defendant down the stairs, found a stick and started to beat him. Defendant left.

This story, told by Mrs. Porter, was corroborated in several respects by Mrs. Lewis. She stated that when she was awakened, Mrs. Porter charged defendant with having raped her, and that defendant then admitted to having a knife; that she told defendant: ''If you are not guilty, you will stay here until I call the cops,'' but defendant said: ''I am getting out of here''; that Mrs. Porter was hysterical, started to beat defendant with her shoe, chased him down the stairs, and started to beat him with a stick; that defendant then pulled a knife and left. Mrs. Lewis also testified that when Mrs. Porter arrived she was carrying the bag containing the beer and cupcakes, which were all crushed, and that the next morning she noticed Mrs. Porter's face was bruised.

It was stipulated that, if a certain doctor were called, he would testify that when he examined Mrs. Porter that morning about 6 a. m. he made a smear test and found spermatozoa.

Mr. Moton was called as a defense witness. He testified that Mrs. Porter was a regular customer, was in his establishment several hours on the night in question, corroborated the story about Mr. Hamilton, but testified that defendant, who bought a lot of people drinks that night, had bought the third beer for Mrs. Porter and that he told this to her.

Defendant told a rambling and somewhat incoherent story. In substance, it was that he had purchased a beer for Mrs. Porter that evening and that while he was paying for it, she expressed her thanks and looked at him ''approvingly''; that he left Moton's before Mrs. Porter and when he returned she had left; that he then left; that at 32nd and Louise

Streets Mrs. Porter came by, thanked him for the beer and asked him to walk her home; that she talked to him about her unhappy home life and told him that she was thinking of becoming a prostitute; that they passed a parked automobile and Mrs. Porter said that she knew the owner and suggested that they get in; that they did so, and drank some beer; that they discussed the prices Mrs. Porter should charge if she became a prostitute; that they then proceeded from hand-holding, to kissing, to intercourse; that all this was done with Mrs. Porter's consent and without resistance. He denied threatening Mrs. Porter with a knife. He also testified that he walked Mrs. Porter home and stated that she offered him the sweater when he said that he was cold. He admitted accompanying Mrs. Porter to her bedroom, and agreed that Mrs. Porter awakened Mrs. Lewis, but testified that then a Mr. James Lewis, the male roomer in the house and a relative of Mrs. Lewis, came to the bedroom door and asked Mrs. Porter where she had been and why she was getting home so late; that it was not until then that Mrs. Porter accused him of rape. From that point on his story agrees substantially with that of Mrs. Porter and Mrs. Lewis.

The defendant was arrested the next day at his home, and at that time denied having had intercourse with Mrs. Porter. He told the police a story, inconsistent in some respects, with the one told at the time of trial. In particular he did not tell the police the story that he later told at the trial to the effect that the charge of rape was made by Mrs. Porter to justify coming in at such a late hour.

On this appeal the appellant attacks the story told by Mrs. Porter, points out several inconsistencies between her story at the preliminary and at the time of trial, and contends that her whole story was incredible. He claims that the testimony of Mrs. Lewis should be discounted because she was "biased." As already pointed out, these were matters which should have been, and were, urged before the trial court. The trial judge has weighed the evidence and found that Mrs. Porter and Mrs. Lewis were telling the truth and that the defendant was not. This was a matter for the trial court. While Mrs. Porter's story about the defendant accompanying her into her home after just forcefully raping her is hard to understand, it is not so incredible that it can be discounted as a matter of law. The evidence is sufficient to sustain the judgment.

418

Appellant argues that the evidence does not support the necessary implied finding of forceful rape, contending that the record does not show sufficient resistance. It must be remembered that defendant was armed with a lethal weapon, a knife, which he had placed at Mrs. Porter's throat. As was said in a similar case—*People* v. *Harris*, 108 Cal. App.2d 84, 89 [238 P.2d 158]: "Her yielding to a superior force rather than suffer the possible consequences was more discreet than to cry up to the stars and be left in the gutter unconscious, if not dead." Thus, there was a reasonable explanation of why Mrs. Porter did not cry out. The trial court was justified in believing that Mrs. Porter feared for her life and so accepted the rape to avoid being killed. That is certainly enough to justify the implied finding that the rape was forceful and against her consent. (See *People* v. *Kinne*, 25 Cal.App.2d 112 [76 P.2d 714].) The cases cited by appellant do not hold to the contrary. They are all distinguishable on their facts.

The judgment and order appealed from are affirmed.

Bray J., and Wood (Fred B.), J., concurred.